```
F5CTTAA
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                                    11 CR 878 (LAK)

VLADIMIR TSASTSIN,

           Defendant.

------------------------------x

                                       New York, N.Y.
                                       May 12, 2015
                                       3:30 p.m.

Before:

                   HON. LEWIS A. KAPLAN,

                                  District Judge

                       APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
SARAH LAI
     Assistant United States Attorney

ROTHMAN, SCHNEIDER, SOLOWAY & STERN
     Attorneys for Defendant
JEREMY SCHNEIDER
DAVID STERN
LUCAS ANDERSON

1             (In open court)
2             DEPUTY CLERK:  United States against Tsastsin.
3    Government, are you ready?
4             MS. LAI:  Yes, Sarah Lai for the government.  Good
5    afternoon.
6             THE COURT:  Good afternoon.
7             DEPUTY CLERK:  For the defendant?
8             MR. SCHNEIDER:  Jeremy Schneider, David Stern, and
9    Lucas Anderson on behalf of Vladimir Tsastsin.
10            THE COURT:  Good afternoon.
11            I'll hear from the defendant.  Let's try to do it in
12   20 minutes, if we could.
13            MR. SCHNEIDER:  Well, your Honor, I guess what I would
14   like to do is, if it's okay with your Honor, is generally I
15   don't feel the need to repeat what is up here because I have
16   confidence that you read it.
17            It's our position, though, that what appears to may
18   have not passed sniff test because it may appear to be illegal,
19   the fact is it's not -- the conduct here was not illegal.  The
20   conduct here does not fit either within the wire fraud statute
21   or the computer fraud statute.  The conduct here may have been
22   annoying to computer users, but what you have here is computer
23   users who are given a choice to either authorize or not
24   authorize a licensing agreement.
25            THE COURT:  And where in the indictment will I find

F5CTTAA

1   that?
2              MR. SCHNEIDER:  You won't.
3              THE COURT:  That's why you lose --
4              MR. SCHNEIDER:  Well --
5              THE COURT:  -- on of that argument.
6              MR. SCHNEIDER:  I'm just giving you general
7   background.  The argument here is in the indictment all they
8   talk about, your Honor, is the victims being the end computer
9   users.  They don't talk about the victims in the indictment as
10  the advertisers.  They don't talk about victims --
11             THE COURT:  What rule of procedure requires that they
12  identify by use of the word "victim" each and every victim of
13  the scheme, or category of victim?
14             MR. SCHNEIDER:  I think the rule of procedures is that
15  they have to give you notice of who you will be defending
16  against.
17             THE COURT:  You know that.
18             MR. SCHNEIDER:  Well, I know, and the fact is there
19  are no victims.  The victims that they named -- not that they
20  named, they alleged -- were the victims of the end of the
21  computer use, not the advertisers.  Because the advertisers did
22  not lose one penny.  The advertisers were not victims.  There
23  was nothing obtained --
24             THE COURT:  I don't understand that at all.  Maybe you
25  can explain to me why that is so, because I don't get it.

1    MR. SCHNEIDER: What's easy is that the advertisers
2    paid -- had an agreement with the defendants. The agreement is
3    that if such and such -- if someone clicks on to my
4    advertisement, you will get -- you, the defendant, will get a
5    certain amount of money. That's what it's about.
6    At some point a computer user decides to do a search,
7    that computer user either searches for a particular item, let's
8    say the IRS, whatever it is, and a number of different
9    advertisements come up. They are never precluded from getting
10    what they want. They are never prevented from getting to the
11    web site that they want.
12    THE COURT: Suppose that I'm the advertising manager
13    for Subaru and I enter into a contract with your client --
14    MR. SCHNEIDER: Yes.
15    THE COURT: -- to pay for clicks by people who meet a
16    demographic, or however else they target this kind of
17    advertising, I don't profess to be an expert at all, who I
18    think, as the Subaru advertising director, are people who are
19    red hot candidates to buy a Subaru. And by virtue of what your
20    clients did, what I get is people who were actually looking for
21    Dr. Scholls insoles for shoes because their feet hurt.
22    Now they make that search, but their demographics are
23    totally different. My Subaru ad gets hit all right, but it
24    gets hit by a category of people entirely different from what I
25    thought I was signing up to get.

1          MR. SCHNEIDER:  They wouldn't hit on that category,
2  because if I'm looking for a Subaru and all the sudden I hit a
3  particular advertisement and something comes up for
4  Dr. Scholls, I'm not going to click on Dr. Scholls, I will keep
5  looking until I get to Subaru.
6          THE COURT:  Mr. Schneider, I'm afraid you can talk
7  faster than I can listen at my age.
8          MR. SCHNEIDER:  I apologize.
9          THE COURT:  Try me again.
10         MR. SCHNEIDER:  I certainly will, and I promise I'll
11 be slower.
12         If I, as the user, are looking for a Subaru, if
13 another advertisement pops up that is not what I'm looking for,
14 I am not going to click on that.
15         THE COURT:  But that's not my hypothetical.
16         MR. SCHNEIDER:  The advertiser gets paid as a result
17 of a click, not just if it pops up.
18         THE COURT:  I know that.  But I don't for a minute
19 think, and certainly I can't assume on a motion to dismiss the
20 indictment, that the world is so simple that the only people I,
21 as the advertising director of Subaru, am interested in getting
22 to click on my site are people who say ah-hah, I want to look
23 at the Subaru web site.  What I may want to get is people who
24 have bought through mail order products that males in a certain
25 income category from 27 to 42 tend to look for because that

F5CTTAA

1  demographic has a much higher chance of buying a Subaru than
2  people who are looking for insoles for their old-man, old-lady
3  shoes.
4        MR. SCHNEIDER:  I have a couple of responses.  Number
5  one, that is not anywhere alleged in the indictment, your
6  scenario.
7        THE COURT:  But it's not negated either.
8        MR. SCHNEIDER:  But I think it is, because the
9  government's theory on this indictment -- if you look at the
10 four corners of the indictment -- is that the computer users,
11 based on the activity of the defendants, the defendants
12 affected that individual computer's use, according to the
13 government; not the advertisers, not the Subaru-looking --
14       THE COURT:  But of course, because by infecting the
15 computers they affected the category of people who wound up
16 clicking on your defendant's advertisers' links or sites or
17 whatever the right word is, but they get a different population
18 of people than they thought they were getting.
19       MR. SCHNEIDER:  A few things.  One, the indictment and
20 the government does not allege that those advertisers are the,
21 quote, victims, number one.
22       THE COURT:  What says they have to?
23       MR. SCHNEIDER:  I believe that --
24       THE COURT:  Why isn't it sufficient if a properly
25 instructed jury could find that the advertisers are victims?

1       MR. SCHNEIDER: Because I think the government is now
2  trying to amend the indictment significantly where it would
3  change the whole theory of their prosecution and thereby
4  changing the theory of our defense. Because I have to defend
5  against who I think the victims are, not who the advertisers
6  are, number one.
7       Number two, again regarding the Subaru advertiser,
8  regardless of who their demographic is, if the person who is on
9  the computer sees that it is not the advertisement that they
10 are looking for, they will not click on it. Therefore, the
11 advertiser -- it just pops up, when it pops up they see this is
12 not what I want, and they don't click on it. They don't say:
13 What is this about? Just because it pops up doesn't mean the
14 user looks at it and uses it. They look at it, see this is not
15 what I want, let me keep looking for something else and then I
16 will find something else.
17      THE COURT: And I would find that in the indictment
18 where?
19      MR. SCHNEIDER: That's exactly my point. You won't.
20 That's exactly the point.
21      THE COURT: So the premise of your argument I'm not
22 going to find in the indictment.
23      MR. SCHNEIDER: Yes. The answer is yes. The premise
24 of my argument is that you need to find the victims. I'm
25 prepared to address with you who the victims are and why they

1  are not in fact victims according to the government's theory.

2  So you're right, you can look at the indictment all
3  you want and you will not see what I'm saying, because what I'm
4  saying is not part of the government's theory in the four
5  corners of the indictment.  And I addressed why we believe the,
6  quote, victims, were not victims, because nothing was obtained
7  or nothing was given up by them, their computers were not
8  destroyed or damaged, they were not in a position where any
9  information or data was taken or where they would be --

10  THE COURT:  Let me ask you this, I'm looking at
11  paragraph five of the indictment, to pick one at random:  As a
12  result of this scheme, the defendants and their co-conspirators
13  reaped at least 14 million in ill-gotten gains through click
14  hijacking and advertising replacement fraud.

15  Now the only money that changed hands was the payment
16  by the advertisers to the defendants.  Isn't it entirely
17  appropriate for a jury, depending on the evidence, to conclude
18  that the people who paid the $14 million were victims; maybe
19  not the only victims, but victims

20  MR. SCHNEIDER:  There's a difference between being the
21  only victims if you have, say, ten of the same category -- in
22  other words, if they're all -- if the government only alleges
23  let's say five advertisers but include five more advertisers at
24  trial but it's the same concept, that's different.  This is
25  changing the entire theory.

1      THE COURT:  You're all wound up, and I appreciate it.
2 Good lawyers get wound up on their client's behalf.  But try to
3 stay with me, because I know what you're arguing and I see
4 holes in it, and I'm trying to address the holes.
5      MR. SCHNEIDER:  I understand.
6      THE COURT:  That's what I'm trying to get at.  I know
7 you think that because in one place they said the computer
8 owners or whatever were victims, I know that's your argument.
9 I got it.
10      MR. SCHNEIDER:  Okay.
11      THE COURT:  But I'm saying the indictment alleges that
12 $14 million in ill-gotten gains came from advertisers.  Now
13 what I don't understand is why that isn't good enough all by
14 itself.
15      MR. SCHNEIDER:  Because I believe not one advertiser
16 has ever spoken to the government to say we are objecting to
17 what happened, we don't like what happened.  This is purely
18 speculative.  The advertisers could be very happy.  They could
19 have said:  You know what?  We thought that there was one
20 demographic out there, and all the sudden we have a result of
21 all the people we didn't think about and got all this
22 advertisement and we're happy to pay the defendant.  We have
23 not idea.  It's speculative.  It's not something that the
24 government has any knowledge of or facts of.
25      DEPUTY CLERK:  Suppose your guy was involved in

1   selling a used car --

2           MR. SCHNEIDER:  A Subaru?

3           THE COURT:  Could be a Subaru.

4           -- and he thinks it's got 40,000 miles on it, because
5   that's what your client told him, and he got a premium price
6   for that Subaru, your client, and the use of mails were
7   involved in the sale.  But he rolled back the odometer, it
8   really had 100,000 miles.  You think it's a defense to a mail
9   fraud claim to say --

10          MR. SCHNEIDER:  Completely different.

11          THE COURT:  You don't even know the question yet.

12          You think it's a defense to a mail fraud claim to say
13  well, the guy who bought the Subaru with 100,000 miles on the
14  representation that it had 40,000 miles is prepared to come in
15  and say I'm perfectly happy?  You think that's a defense?

16          MR. SCHNEIDER:  If he thought he wasn't defrauded, if
17  he don't lose anything.  But the fact is, that's different.

18          THE COURT:  He did lose something.

19          MR. SCHNEIDER:  That car is not worth the same thing,
20  100,000 versus 40,000.

21          THE COURT:  Right.  And the guy who winds up on this
22  web site is not the same thing as the guy who would have gotten
23  there but for the fraud.  It's not the same viewer.

24          MR. SCHNEIDER:  To obtain property from someone,
25  physical property from someone that has value, it has value,

1   it's valued at one thing when it has 40,000 miles and it's
2   valued another way at 100,000 miles.  If you get somebody to
3   pay more than it's worth because you mislead them, that is
4   fraud.  This is not the same thing.  You have no idea if
5   anybody was misled.  You don't know if the advertisers were
6   happy or not.  You don't know if they felt misled.  This is not
7   just speculation, but even accepting what they say --
8             THE COURT:  None of those things is an element of mail
9   fraud conviction.
10            MR. SCHNEIDER:  The element of mail fraud conviction
11  is property was obtained --
12            THE COURT:  By false or fraudulent pretenses, and the
13  mail was used in furtherance.
14            MR. SCHNEIDER:  What property was obtained
15  fraudulently?
16            THE COURT:  Money that the advertisers paid to your
17  clients.
18            MR. SCHNEIDER:  Number one, I don't mean to keep
19  repeating, but that's not what the indictment says.
20            THE COURT:  I just read it to you.
21            MR. SCHNEIDER:  You read the background of this
22  scheme.  That is not the same thing as identifying them as
23  victims.  That's number one.  That's not -- that's the
24  background portion of the indictment, not in the counts of the
25  indictment, not in the specific wire fraud, computer fraud

1    counts of the indictment.
2             THE COURT:  If you have another point I suggest you
3    move to it, because that one is not -- my understanding of it
4    is not being enhanced by repetition.
5             MR. SCHNEIDER:  That's what I started out by saying.
6    I understand.  I don't feel the need to go into any other
7    specifics.  I believe that whatever is in our papers is
8    actually compelling.  Whether you chose to accept it, that's
9    why you're the judge sitting there.  I believe that what we
10   say, the law is good, I think in terms of the facts here and
11   the statutes, I think the government is trying to put this
12   conduct into illegal activity that has not been considered by
13   the legislature.  That I think is significant.
14             I think the rule of levity is when there's a doubt as
15   to how the statute should be interpreted should go to the
16   defendant.  I think that's something that applies here.  There
17   has not been one case that has addressed the click fraud or
18   advertising hijacking situation criminally.  The civil cases
19   that have addressed it have found this to be maybe bad
20   advertising, maybe poor business activity, but not illegal, and
21   not even civilly liable.
22             And I think that's significant, because like your
23   Honor has a reaction to the conduct, I think that reaction is
24   not supported by the statute the way it is now.  At some point
25   the legislature can fix it.  They may want to change the

1    statute.  They may want to amend it or have a new statute that
2    applies to this particular conduct, but I think this conduct is
3    not covered by the statute as it's charged and is not alleged
4    in the indictment appropriately.
5             THE COURT:  Okay.  Thank you.
6             Ms. Lai.
7             MS. LAI:  Judge, I haven't heard anything that was not
8    already in the briefs which the government has addressed in
9    great detail.  So unless the Court has any questions, we simply
10   rely on our brief.
11            THE COURT:  Well, I'm very interested in why the
12   government either didn't refer at all or certainly didn't rely
13   on Salinas Doria on the *non bis in idem* argument.
14            MS. LAI:  Why we didn't rely on the *non bis in idem*
15   argument?
16            THE COURT:  No, why you didn't rely on the Salinas
17   case, which is the case that says that *non bis in idem* doesn't
18   apply at all in circumstances like this.  *Non bis in idem* is an
19   objection available to someone as against the requested state
20   in an extradition, not as a defense to the offense for which
21   the person was extradited, to a receiving state by the
22   requested state, which seems to me to sweep the boards.  So I
23   don't understand what I'm missing here as to why the government
24   didn't even rely on it.
25            MS. LAI:  Is this the Second Circuit case that the

F5CTTAA

1  defense cited?  I couldn't hear the name of the case.
2          THE COURT:  It's Salinas, Judge Lynch's case while on
3  the district court.
4          MS. LAI:  I'm not familiar with that case.  I didn't
5  come across it, your Honor.
6          THE COURT:  Okay.  Well, I guess that's the answer.
7          MS. LAI:  But the Second Circuit case that the defense
8  did rely on the government believes to be dictum because the
9  decision was not based -- there was a lot of discussion about
10 looking at the conduct rather than the specific offense.
11         THE COURT:  I agree with you that it's dictum.  You're
12 talking about Sindona, right?
13         MS. LAI:  Yes.
14         THE COURT:  But Sindona had been extradited from
15 Italy, is that right?
16         MR. SCHNEIDER:  To Italy.
17         THE COURT:  It was an Italian extradition request.  He
18 was facing indictment here, right?  And it's a different
19 circumstance, in addition to being dictum, and arguably wrong
20 anyway, which one doesn't say about Judge Friendly too often.
21         Well, the long and short of it is I guess you didn't
22 have Judge Lynch's decision.  But I was also curious at the
23 fact that the government didn't place any reliance that I
24 noticed on the text of the extradition treaty with Estonia,
25 which says, very differently from the Italian treaty:

1    Extradition shall not be granted when the person sought has
2    been convicted or acquitted in the requested state for the
3    offense for which extradition is requested.
4             It doesn't say anything about prosecution on the other
5    side.  There's no agreement by the United States not to
6    prosecute somebody extradited from Estonia for an offense of
7    which the person had been convicted or acquitted in Estonia,
8    which is essentially what the Italian treaty said.
9             So why can't this *non bis in idem* be resolved simply
10   on the basis of the text of the treaty?  Estonia extradited
11   him.  The treaty says nothing more than they won't extradite
12   him if they think he's been acquitted or convicted of the
13   offense.  Doesn't say anything about what we're going to do.
14            MS. LAI:  Right.  They agreed to extradite based on
15   their reading of the case there.  The Court could resolve it
16   that way, and I appreciate the Court coming up with better
17   arguments than I have.
18            THE COURT:  I didn't mean to suggest that, but that
19   really follows from Judge Lynch's decision.
20            MS. LAI:  I was focused on the word "offense," which
21   is the defense argument.
22            THE COURT:  Yeah.
23            MS. LAI:  The treaty does say the same offense.
24            THE COURT:  I understand.  I understand the whole
25   Blockburger argument, but Blockburger is a lot more complicated

F5CTTAA

1  argument than the text of the treaty.
2          MS. LAI:  Yes.
3          THE COURT:  All right.  Thank you.
4          MS. LAI:  Thank you.
5          THE COURT:  Anything else?
6          MR. SCHNEIDER:  No, your Honor.
7          THE COURT:  Okay, I appreciate it.  Thank you.  Some
8  interesting issues.  I will reserve decision, but now we're
9  down for trial when?
10         MR. SCHNEIDER:  I believe September 28.
11         THE COURT:  September?
12         MS. LAI:  28.
13         MR. SCHNEIDER:  28.
14         THE COURT:  We may have to make a tiny adjustment in
15 that.  How long a trial is it likely to be, Ms. Lai, now that
16 we're further down the road?
17         MS. LAI:  I still think it will be about a month,
18 three weeks to a month.
19         THE COURT:  Defense agree with that?
20         MR. SCHNEIDER:  If that's their case it will be longer
21 because we'll be presenting a case, I presume.
22         THE COURT:  We have a little bit of a scheduling
23 problem here.  The multidistrict panel is sitting the end of
24 the week of the 28th of September.  If we start on the 28th,
25 we're not going to sit Wednesday, Thursday or Friday that week.

F5CTTAA

1  Now maybe we'll just do that.
2           Then I have to be at a multidistrict panel event out
3  of town all or most of the week of October 26.  So if this is
4  really a four-week trial, this is going to get complicated.  If
5  it's really going to be four weeks plus, we can start on the
6  28th and go as far as we can and then resume the following week
7  and we'll have a dark week or part of a week.
8           MR. SCHNEIDER:  That's fine with us, Judge.
9           THE COURT:  Any problem?
10          MS. LAI:  No, your Honor, that's fine.
11          THE COURT:  Then we'll plan on that, and we'll work
12  around these other commitments.  It will be a busy fall.
13          Thanks very much.
14                                 o0o