G4QVTSAS

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          11 CR 878 (LAK)

5    VLADIMIR TSASTSIN,

6              Defendant.                  SENTENCE

7    ------------------------------x

8                                          New York, N.Y.
                                           April 26, 2016
9                                          4:52 p.m.

10
     Before:
11
                      HON. LEWIS A. KAPLAN,
12
                                           District Judge
13

14                        APPEARANCES

15

16   PREET BHARARA,
          United States Attorney for the
17        Southern District of New York
     SARAH Y. LAI
18        Assistant United States Attorney

19   ARKADY BUKH
     CHARLES W. KASER
20        Attorneys for Defendant

21   ALSO PRESENT:  SAMAD SHAHRANI, FBI
                    YANA AGOUREEV, Russian Interpreter
22

23

24

25

G4QVTSAS

|    |    |
|----|----|
| 1  | THE DEPUTY CLERK:  *United States v. Vladimir Tsastsin*. |
| 2  | Government, are you ready? |
| 3  | MS. LAI:  Yes. |
| 4  | Sarah Lai for the government. |
| 5  | Your Honor, with me is Special Agent Sam Shahrani of |
| 6  | the FBI. |
| 7  | Good afternoon. |
| 8  | THE COURT:  Afternoon. |
| 9  | THE DEPUTY CLERK:  Defendant, are you ready? |
| 10 | MR. KASER:  Yes, your Honor. |
| 11 | My name is Charles Kaser; I work with Mr. Bukh.  I |
| 12 | just filed, I believe, a notice of appearance electronically |
| 13 | today.  I just want to make you aware of that because I haven't |
| 14 | appeared on the record yet. |
| 15 | THE COURT:  Okay.  You have now. |
| 16 | Pardon? |
| 17 | MR. BUKH:  My name is Arkady Bukh; I'm attorney for |
| 18 | Mr. Tsastsin. |
| 19 | THE COURT:  All right. |
| 20 | THE DEPUTY CLERK:  Please be seated. |
| 21 | THE COURT:  So, Mr. Kaser, have you and your client |
| 22 | both had the presentence report for the necessary period and |
| 23 | both read it? |
| 24 | MR. KASER:  Yes, your Honor. |
| 25 | THE COURT:  It will be sealed and made available to |

G4QVTSAS

1    counsel in the event of an appeal.

2            Are there any unresolved objections to the presentence

3    report?

4            MS. LAI:  Not that I know of, your Honor.  There is a

5    guidelines calculation issue because I believe that the

6    presentence report was issued before the new guidelines for

7    fraud cases came into effect, and so I think we need to make an

8    adjustment in the presentence report's guidelines calculation.

9            THE COURT:  All right.

10           Well, just before that, I have not remembered that the

11    defendant is not a speaker of English as a first language.

12           What is your first language, Mr. Tsastsin?

13           THE DEFENDANT:  (In English) Russian.

14           THE COURT:  The defendant answered in English.

15           Do you understand me in English, Mr. Tsastsin?

16           THE DEFENDANT:  (In English) Yes.

17           THE COURT:  And you're using a translator, a Russian

18    translator; is that right?

19           THE DEFENDANT:  (In English) Yes.

20           THE COURT:  All right.

21           Did you read the presentence report in English?

22           THE DEFENDANT:  (In English) Yes.

23           THE COURT:  Did you understand it?

24           THE DEFENDANT:  (In English) Yes.  Perfectly.

25           THE COURT:  All right.  Fine.  Thank you.

G4QVTSAS

1          All right.  Ms. Lai, let's come back to the guidelines

2     issue to which you refer.  Please's lab bore rate.

3          MS. LAI:  So I've discussed this with defense counsel.

4     The parties are in agreement under the new sentencing

5     guidelines.  The enhancement under 2B1.1, based on the number

6     of victims, has been changed so that it is actually more

7     lenient to the defendant.

8          So we believe that the enhancement, based on the

9     number of victims, which is 2B1.1 (b)(2), under the new

10    guidelines, the government is required to show that the offense

11    resulted in, quote, substantial financial hardship to different

12    numbers of victims, which would trigger different levels of

13    enhancements.  The government will concede that it cannot

14    satisfy that particular definition, which is found in 2B1.1

15    under the application note 4, subsection 5 -- I mean, I'm

16    sorry, subsection F.  So instead of being a six-level increase

17    based on the number of victims, the increase should simply be

18    two levels under 2B1.1 2A, which does not require the

19    substantial financial hardship element.

20          THE COURT:  Is the bottom line of this that the --

21          MS. LAI:  We knock four levels off the offense level

22    from what the probation has calculated.

23          MR. KASER:  In addition to that, also off the

24    stipulated guidelines range that we had --

25          MS. LAI:  Well, no.  The stipulated guidelines range

G4QVTSAS

1    is the stipulated guidelines range.  That was the plea

2    agreement entered into and that's what the defendant pleaded

3    to.

4             MR. KASER:  Fair enough.

5             But the offense level we were discussing previously

6    should go from 28 to 24, that's your understanding?

7             MS. LAI:  No.  I'm saying that when the Court

8    calculates the guidelines for the record based on what

9    probation has set forth in the PSR, it should be four levels

10   less than what probation has calculated.  The agreement between

11   the parties remain.

12            MR. KASER:  So that should still be 28?

13            MS. LAI:  Yes.

14            MR. KASER:  Okay.

15            THE COURT:  So the long and the short of all this is

16   that the guideline offense level is 28, both as stipulated and

17   as calculated under the revised guidelines, and the guideline

18   range is 78 to 97 months under both.  They are now both

19   consistent.

20            Does everyone agree to that?

21            Ms. Lai?

22            MS. LAI:  The outcome, yes.  How we get there is

23   different, but the outcome is the same because probation has

24   added four points for leadership role, which the government is

25   not seeking.

G4QVTSAS

1              MR. KASER:  And so by that argument, I would then say

2      that it shouldn't even be 28; it should be four points even

3      lower than that because no one is seeking the leadership role.

4      That's just my argument.

5              THE COURT:  But look --

6              MR. KASER:  I know.

7              THE COURT:  -- you made a deal.  And it was entirely

8      foreseeable when you made the deal and stipulated to a

9      guideline range that the guidelines could change.

10              MR. KASER:  Correct.

11              THE COURT:  Your deal had no saving clause that gave

12      you effectively kind of an analogy to a most favored nations

13      clause.  You made your deal and you've got to live with your

14      deal.

15              MR. KASER:  Right.  Although it was the purview of the

16      change in law.  But I do agree this was a deal knowing that

17      there could be a change that could benefit or to his detriment

18      also.

19              THE COURT:  Okay.

20              MR. KASER:  But just reiterating that they are

21      guidelines, so I would just ask that that be taken into account

22      when the ultimate sentence is handed down.  But you're correct.

23              THE COURT:  The guideline range is 78 to 97; correct?

24              MR. KASER:  Correct.

25              THE COURT:  And the guideline range that probation

G4QVTSAS

1    recommends is 78 to 97, right?

2            MS. LAI:  It's actually higher, your Honor.

3            THE COURT:  How can that be?

4            MS. LAI:  Because they did not take into consideration

5    the new guidelines.  So I'm just trying to find the right

6    section.

7            In any event, they calculate level 32.  So level 32 --

8            THE COURT:  They calculated 32.

9            MS. LAI:  Which would be 121 to 151 months.

10           THE COURT:  Back up.

11           They calculated 32 on the assumption that the offense

12   level would be increased six levels.

13           MS. LAI:  Right.

14           THE COURT:  And you're saying that if we calculate

15   that today, as we should for purposes of assessing the

16   presentence report, it would be a two-level upward adjustment,

17   not six, and, therefore, the offense level of 32 would drop to

18   28.

19           MS. LAI:  Yes, that I agree with.

20           THE COURT:  Okay.

21           MS. LAI:  I thought you were referring to what was

22   actually in the report.

23           THE COURT:  I'm not even going there.

24           The bottom line here is that I find both on the basis

25   of the stipulation and on the basis of the presentence report

1    that the offense level is 28 and that the guideline range is 78

2    to 97 months.

3            Anybody disagree?

4            Going once, going twice, sold.  We're done with that.

5            Now, I have received in relation to the sentence the

6    government's sentencing memorandum which was filed April 22nd.

7    I received, it having been filed after 8 o'clock last night, a

8    sentencing memorandum from Mr. Bukh to which was appended 34

9    letters from friends and relatives abroad.

10           Is there anything else of which I ought to be aware

11   of?

12           MS. LAI:  The government is guilty of being one of the

13   ones who submitted a late forfeiture order, yes, thank you,

14   your Honor.

15           THE COURT:  Has this been signed yet?  Please hand it

16   up.  Thank you.

17           Okay.  I will then hear Mr. Kaser or Mr. Bukh, whoever

18   wants to speak, on behalf of the defendant.

19           MR. KASER:  Yes.  Thank you, your Honor.

20           Your Honor, my client is a very talented and

21   intelligent person.  However, it is very unfortunate to see

22   this man in this courtroom today.  The reality is though that

23   he has pled guilty to some very serious federal offenses, and

24   in a short period he will be sentenced for those crimes.

25           He does fully accept responsibility for his actions

G4QVTSAS

and deeply regrets that his actions have caused the necessity

for the government to investigate and prosecute him.  He is

extremely embarrassed and humiliated by his actions.

He has attempted to cooperate with the government in

this situation; although there hasn't been a 5K1 letter, he did

make several attempts to try to assist in this.  In addition to

this, he has been incarcerated for this offense since 2011,

somewhere around 50 months or so that he's been in, both in

Estonia and here.

Now, when he was arrested back in 2011, he had just

given birth -- well, his wife had just given birth to a child

four months previously.  He hasn't seen that child since.  His

child is probably close to five now and he hasn't seen his

child since she was four months old.

As you've seen from the many letters, he has very

strong family ties.  He has many friends who came to his

support.  They've been supporting him throughout this entire

ordeal.

In addition, as found in our sentencing letter, we

would respectfully ask this Court to keep Mr. Tsastsin's

sentence consistent with those of the codefendants and the

sentences that they received; and also bearing in mind that he

has spent almost five years currently incarcerated.

Now, considering the extent of his remorse, his

attempts at cooperation, his personal characteristics, the

G4QVTSAS

1    letters from friends and family, I would ask that a

2    nonguideline sentence of time served be implemented.

3         Some additional points that I wanted to bring up.

4         He will, when he's done with this case, have to go

5    back to Estonia.  He will serve time in Estonia.  He has,

6    unlike, I believe, some of the other codefendants, paid upwards

7    of $2.5 million in forfeiture.  I believe this should be taken

8    into account.  Again, basically if he has to serve out an

9    additional, it can be a 78-month sentence, he might be looking

10   at twice as long as he was in for the other events.

11        THE COURT:  Twice as long as what?

12        MR. KASER:  Withdrawn, your Honor.

13        My concern is that because of the way it was –– the

14   charges that were brought in Estonia versus the charges that

15   were brought here, no double jeopardy attaches, but it is still

16   arising out of the same incidents.  And so he could basically

17   be doing double-time for one incident, having to do the time

18   here and then having to go to Estonia and doing the time there.

19        THE COURT:  My understanding was that he was

20   prosecuted and convicted for money laundering by Estonia,

21   right?

22        MR. KASER:  I believe that is the case; correct.

23        THE COURT:  He wasn't prosecuted for the fraud.

24        MR. KASER:  That is my understanding, your Honor.

25   However, I was not over there.  I'm not saying that's the same

G4QVTSAS

charge here, which is why double jeopardy did not attach.  What

I'm saying is I'm not sure if -- I'm sure that Estonia could

have gone after those offenses, but possibly chose not to to

allow the United States --

THE COURT:  I'm not sure of that at all.

MR. KASER:  It is a possibility.  I can't speak to

that, but it all arises from the same incident.  I'm just

stating that he will have to serve time there.  He's served

already close to five years on this matter, and I'm just asking

that in light of these facts, in light of the fact that he has

been incarcerated, that he be sentenced to time served so he

can face the issues now in Estonia where he will be sentenced.

THE COURT:  Thank you.

Mr. Tsastsin, is there anything you'd like to say?

THE DEFENDANT:  Yes.

THE COURT:  Please go ahead.

THE DEFENDANT:  (In English) Your Honor, if somebody

told me a few years ago that I will be standing here in federal

court as a defendant in this serious criminal case, I will

never believe that.  However, I am here and I have to deal with

the reality.  All my life I never intended to hurt no one, but

unfortunately my action caused financial damage.  I can only

attribute this result to my own stupidity, poor judgment, and

wrong decisions.  I want everybody in this courtroom to

understand that my action inexcusable.  I deeply regret what I

G4QVTSAS

1    did, and for this I apologize to you, to government, and to

2    people of United States.

3              I have tried very hard to make it up to this country,

4    as I was proactively cooperating with the government, as I'm

5    driven to continue to assistance if government need my help.  I

6    know your Honor you will do what you believe is right, and I am

7    fully prepared to accept whatever decision you make.  I got

8    myself into this predicament, and I will take responsibility

9    for my conduct.

10             However, I just want to let you know that I would

11   never repeat this mistake again and I will never break any law.

12   Please let me rebuild my life and reunite with my family.

13             Thank you very much.

14             THE COURT:  Thank you.

15             MR. KASER:  Your Honor, just one more thing I forgot

16   to mention.  I apologize.

17             As I said before, I believe my client has spent about

18   half of this 50-odd months in an Estonian jail, where the

19   conditions are less than ideal.  And I would ask that he be

20   afforded more than day-by-day; maybe a day and-a-half for the

21   time he spent there.

22             THE COURT:  All right.  Thank you.

23             Ms. Lai?

24             MS. LAI:  So I'm sure the Court recalls, but with

25   respect to the codefendants, the Court did give one and-a-half

day credit for each day incarcerated in Estonia based on the

U.S. sentence, not the entire period of time that the defendant

spent in Estonian jail, because they were there because of the

Estonian charges.

         So if the Court were to inclined to do the same in

this case, I think as a matter of equity it should only apply

to the period of time that he was held in Estonia based on the

U.S. sentence.

         THE COURT:  Which was how long?

         MS. LAI:  It's in the letter.  Let me just get it.  I

think it was approximately --

         THE COURT:  Is that the 19 month --

         MS. LAI:  Yes, it's approximately 19 months; 19 months

and two days, your Honor.

         I believe that this defendant is more culpable than

the codefendants.  He has been involved in this business

longer.  This is not a mistake on the part of someone who

should not have got into what he got into and just made a

mistake.

         He has a prior conviction that was related to computer

hacking in Estonia, not here, so it doesn't count for criminal

history points, but it does count to the nature and

circumstances of the defendant.  He was sentenced to three

years of which he served only about six months, I think.  That

did nothing to deter him from the current crime, which is

G4QVTSAS

1    larger in scale than what he did before involving multiple

2    shell companies, multiple countries, multiple codefendants in

3    Estonia, as well as in the Ukraine and Russia.

4              It is an extremely sophisticated scheme and it

5    illustrates somebody who has spent most of his adult life

6    involved in cyber crime unfortunately.  Prior to that, and the

7    government only learned of this reading the PSR, he had been in

8    the U.S. on a student visa and had been arrested for -- I

9    assume it was a minor crime, because the charges were

10   ultimately dismissed.  So this is a person who has run into the

11   criminal justice system basically his entire adult life.

12             THE COURT:  Let me ask you a question.

13             As I understand it, the PSR says that this defendant

14   is responsible for a loss amount of two and-a-half million

15   dollars, but that Ivanov's comparable figure is 14 million.  My

16   understanding was that this defendant was the ringleader.  Is

17   that wrong?

18             MS. LAI:  He was, yes.  No, it's not wrong, your

19   Honor.

20             Part of the reason was because of the sentences

21   that -- the original sentence imposed on Ivanov and on Valeri

22   Aleksejev, that it was unlikely that the Court would impose a

23   sentence that would reflect the 14 million figure.  And so

24   there seemed to be little sense in insisting on a guidelines

25   range that is outside the realm of a possible sentence.

G4QVTSAS

1          THE COURT:  So am I correct in concluding that under

2    conventional principles as set out in the guidelines manual,

3    and putting aside whatever negotiation that led to the plea

4    agreement, the government's position would be that the loss

5    amount in this fellow's case would be more probably 14 million

6    than two and-a-half million, but for reasons satisfactory to

7    the government, you agreed to two and-a-half million; is that

8    about right?

9          MS. LAI:  Yes.

10          THE COURT:  Okay.  Thank you.

11          MS. LAI:  So in light of this defendant's role

12    relative to his codefendants, we believe that a higher sentence

13    should be imposed that reflects his role in the offense, even

14    though the government is not seeking a leadership enhancement

15    pursuant to the plea agreement.  So unless the Court has any --

16          THE COURT:  Another practical accommodation.

17          MS. LAI:  Well, I think that a lot of time lapsed

18    between the arrest, the pleas of his codefendants, and when

19    this particular defendant finally arrived in the United States.

20    So certain evidence may have gone stale in the time, so there

21    was a practical calculation there as well.

22          THE COURT:  Okay.  Thank you.

23          Mr. Tsastsin, please rise for the imposition of

24    sentence.

25          This was an extraordinarily outrageous scheme that

G4QVTSAS

1    went on over a period of years.  You and your criminal

2    subordinates infected at least four million computers around

3    the world, of which at least a half a million were in the

4    United States.  The losses you caused were at least $14

5    million.  It was brazen, it was sophisticated, it was

6    outrageous, and for whatever practical reasons -- and I'm not

7    being critical of the government -- have brought the government

8    to the arrangement that they reached with you.  You ought to

9    consider yourself a pretty fortunate fellow.

10           It is the judgment of this Court that you be committed

11    to the custody of the Attorney General of the United States or

12    his designee for terms of imprisonment of 60 months on each of

13    Counts One and Two, with 27 months of the term of imprisonment

14    on Count Two to be served consecutively with the term imposed

15    on Count One, and 33 months of the term of imprisonment on

16    Count Two to be served concurrently with the term imposed on

17    Count One, for an aggregate term of imprisonment of 87 months;

18    that you thereafter serve a term of supervised release of one

19    year; and that you forfeit to the United States, in accordance

20    with the consent order of forfeiture that you signed and that I

21    have approved, the sum of two and-a-half million dollars; and

22    that you pay the mandatory special assessment of $200.

23           The term of supervised release shall be subject to the

24    mandatory and the standard conditions of supervision 1 through

25    13, in addition to the following special conditions:

G4QVTSAS

1          You shall follow all directions of the Bureau of

2     Citizenship and Immigration Services in any proceedings it may

3     institute.

4          Two, if you are removed or deported from the United

5     States, you shall not reenter the United States illegally.

6          Third, you are to report to the nearest probation

7     office within 72 hours after you're released from custody.

8          I recommend to the Department of Justice that any

9     application under the International Prisoner Transfer Program

10    or otherwise that would permit the defendant to complete this

11    sentence of imprisonment in Estonia be denied.  This is an

12    extremely serious offense that caused very serious harm in the

13    United States.  It is appropriate that the penalty imposed by

14    United States law be served in a U.S. institution under U.S.

15    control.  I am concerned that Estonia's liberal parole scheme,

16    which is quite different and more lenient than our own, based

17    on what I've been told here, makes the likelihood that the

18    defendant, if transferred to Estonia, would serve the fullness

19    of the sentence I have imposed doubtful.

20         I understand also that one of the objectives of the

21    International Prisoner Transfer Program is to promote

22    rehabilitation.  I consider that a transfer would not promote

23    that goal.  The defendant, in my view, does not evidence any

24    sincere rehabilitation and is not particularly likely to do so.

25         Finally, I believe that a return of the defendant to

G4QVTSAS

1    Estonia would create new dangers to the United States

2    immediately upon his having access to computers, personnel, and

3    the Internet in Estonia.  Thus, this case is not at all typical

4    of other cases in which a foreign national commits a crime in

5    the United States and is permitted to serve out all or part of

6    his sentence in his country of origin.  Typically in those

7    cases, the removal of the defendant from the United States as a

8    practical matter protects the United States against the risk of

9    further criminal activity by that defendant.  In this case,

10   that would not be true because cyber crime knows no

11   geographical boundaries.

12           I advise you, Mr. Tsastsin, that you have the right to

13   whatever extent you haven't waived it to appeal from the

14   judgment imposed in this sentence.  If you wish to appeal, you

15   must file a written notice of appeal with the clerk of the

16   district court no later than 14 days after the date on which

17   judgment is entered, which could conceivably be today.

18           In the event you wish to appeal and you can't afford

19   to pay the fees necessary to do so, you have the right to apply

20   for permission to appeal as a poor person.  If such an

21   application were made and granted, you would be permitted to

22   appeal without payment of the fees; and if you couldn't afford

23   a lawyer, a lawyer would be appointed for you at public

24   expense.

25           I want to be clear that the sentence I have imposed

G4QVTSAS

1    has made allowance for the relative severity of prison

2    conditions in Estonia than the U.S. with respect to that

3    portion of the time the defendant has already served in Estonia

4    solely on account of the U.S. sentence.  I've done that in

5    other instances in this case, I've done it here as well, if

6    perhaps not on precisely the same basis, certainly reasonably

7    close to it.

8              You may all be seated.

9              Is there anything else with respect to the defendant?

10             No?

11             MR. KASER:  No, your Honor.

12             THE COURT:  All right.

13             Now, Mr. Bukh, there's something with respect to you.

14             You submitted late last week a letter application to

15   me to adjourn this sentencing.  In your letter, which came

16   notwithstanding the fact that on February 2nd I ordered that

17   there would be no further postponement of this sentencing,

18   absent, quote, a very good reason, you said the additional time

19   was needed to gather letters from family and others abroad and

20   other information relevant to the sentencing.  I denied that

21   application at about 2:30 yesterday afternoon.  Within six

22   hours, you filed a 16-page sentencing memorandum and what I

23   counted quickly as 34 letters from members of the defendant's

24   family and friends in Russia and Estonia.

25             The question naturally arises in my mind as to whether

G4QVTSAS

1      your letter applying for the adjournment was based on a

2      flat-out lie.  And I'm interested in saying that to you because

3      if there's a response to it that's inconsistent with that

4      initial reaction, I think in fairness to you, I owe you the

5      obligation to explain it to me.

6                  MR. BUKH:  Your Honor, there was really delay with the

7      email.  I've been asking client and they've been working back

8      to Estonia and Russia to assemble that and get it really late.

9      They email all this information.

10                 THE COURT:  I'm sorry, I'm not sure I understood what

11     you said.

12                 MR. BUKH:  We got it very late from the client's

13     family back over the email.

14                 THE COURT:  When you say you got that very late,

15     you're referring to the 34 letters you filed around 8:30 last

16     night?

17                 MR. BUKH:  So but we --

18                 THE COURT:  I'm sorry, just answer that question.  Is

19     that what you're talking about?

20                 MR. BUKH:  That's right, your Honor.

21                 THE COURT:  Aren't they all dated over a year ago or

22     nearly a year ago?

23                 MR. BUKH:  Right.  But they -- they mailed that from

24     Russia, Estonia.  So almost at the same time when we got whole

25     package it was -- it was immediately submitted, so I didn't see

G4QVTSAS

1   them before then.  We got over the email from the families back

2   there, from the single person in one email the whole package

3   and submit it right away.

4              THE COURT:  You got that yesterday, is that what

5   you're saying?

6              MR. BUKH:  Right.  Right, your Honor.

7              THE COURT:  And who is it that received that email?

8              MR. BUKH:  Our office.

9              THE COURT:  Meaning your office?

10             MR. BUKH:  That's right.

11             THE COURT:  Arkady Bukh?

12             MR. BUKH:  That's right.

13             THE COURT:  And when did you ask for them?

14             MR. BUKH:  I mean we've been asking for the long time,

15   but I mean it was -- it was sent and it was lost and then --

16   and then I demanded to do it very quickly because it was too

17   late.

18             But when we got it, we submitted it.  It was few

19   attempts; it wasn't for whatever reason delivered.  It was

20   looks like they -- the family claimed they send it by mail.

21   And then when I begun pushing, then they mailed them.  They

22   scanned them and they mailed them.

23             THE COURT:  You've known since February 2nd the

24   sentencing was going to be tomorrow; you didn't push from

25   February 2nd till yesterday?

G4QVTSAS

1          MR. BUKH:  Your Honor, I must admit, I should have

2     pushed harder.  What else can I tell you?  I mean we really got

3     them -- we just got them.

4          THE COURT:  If there's any evidence of that fact, I

5     would very much suggest you hold on to it because you may not

6     have heard the last of this.

7          Okay.  Thank you, folks.

8          MS. LAI:  Your Honor, I forgot to -- did the Court

9     impose forfeiture?  I can't remember.

10          THE COURT:  I believe I did, but if -- indeed I'm

11     confident I did.  But if I didn't, it is part of the sentence

12     that the defendant forfeit two and-a-half million to the -- two

13     and-a-half million dollars to the United States, more fully set

14     forth in the consent order of forfeiture that I signed today.

15          MS. LAI:  The forfeiture as to the specific property.

16          THE COURT:  Yes, that's in the agreement, right?

17          MS. LAI:  It was the one that was submitted late last

18     night with my apologies.  It's a different one from the one

19     that -- the 2.5 million.  This relates to all the electronics,

20     the one that was just handed up, your Honor.

21          THE COURT:  Yes, yes, I know.

22          It is further adjudged that the defendant forfeit to

23     the United States the specific property enumerated in

24     Attachment A to the consent order of forfeiture as to specific

25     property that I signed earlier.

G4QVTSAS

1              Does that do it for you?

2              MS. LAI:  Yes.  Thank you, your Honor.

3              The government moves to dismiss the underlying

4     indictments and the open counts, your Honor.

5              THE COURT:  Granted.

6              Help get the word out about late submissions.

7              MS. LAI:  I will, your Honor.

8              Thank you very much.

9                          *    *    *